**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| MEREDITH MURPHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 6:25-cv-145-JAR |
| VISION BANK, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

This is an employment discrimination action based on alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 1201 *et seq.*, and Oklahoma public policy. Before the Court is the motion to dismiss [Dkt. 29] filed on behalf of defendant Vision Bank pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff Meredith Murphy timely responded in opposition [Dkt. 33], and Vision Bank submitted a reply brief [Dkt. 35].

**I.     BACKGROUND**

**A.     FACTUAL ALLEGATIONS**

Accepting the factual allegations in the first amended complaint ("FAC") as true, Murphy began working for Vision Bank in 2003 and, by 2019, had advanced to the role of Senior Vice President serving as Senior Operational Risk Officer (ORO), Information Security Officer (ISO), and Fair Lending Officer with responsibility for bank-wide risk assessments and information-security controls. Murphy is a married Methodist mother diagnosed with anxiety and depression. [Dkt. 22, ¶¶ 11-16]. She

1

alleges that Executive Vice President and Chief Operating Officer Debbie Thompson ("Thompson") assured her the ORO position would not require overtime, later made repeated inquiries into her treatment and medications, and from 2023 through Murphy's termination expressed hostility toward Murphy's Methodist faith and toward other employees whose Christian beliefs were visible in the workplace, while not directing similar hostility toward Vision Bank's Southern Baptist president, Steve Bagwell ("President Bagwell"). [*Id.* ¶¶ 17-23].

Murphy further alleges that Thompson treated female employees and mothers less favorably from similarly situated male managers with children. Thompson allegedly criticized Murphy's workload, attributed perceived performance deficiencies to Murphy's childcare responsibilities, stripped Murphy of her supervisory duties, and publicly disparaged female subordinates and mothers, while similarly situated male executives and fathers were not demoted or publicly criticized and in some instances were promoted. Murphy also alleges that Thompson repeatedly injected herself into Murphy's mental-health care by questioning her medications, dosages, and therapist, and that after a February 2, 2024 performance-review meeting, Thompson interrogated her in front of colleagues about an anxiety-induced nosebleed and her medical history. [*Id.* ¶¶ 28-41].

In late 2023, Murphy conducted a phishing test as part of her ISO duties in late 2023. Thompson failed the test and then sent a bank-wide email characterizing the test as illegitimate. Murphy alleges she documented Thompson's conduct as undermining internal controls and information-security efforts, identified Thompson

as a repeat offender on phishing tests, and reported a separate incident in which an employee uploaded confidential customer information into ChatGPT, all in reports to the administrative risk committee and in an Identity Theft Risk Assessment reviewed by the board. [*Id.* ¶¶ 25-27].

On February 2, 2024, when presenting Murphy with her 2023 performance review meeting, Thompson criticized Murphy's volume of work, stated that Murphy's daughter prevented her from working the overtime hours Thompson considered necessary to manage staff, and announced that she would assume management of Murphy's team, acknowledging this change as an "admonishment." [*Id.* ¶ 29]. Murphy alleges she suffered an acute anxiety attack and nosebleed following the meeting, and that Thompson subsequently questioned her in front of coworkers about the frequency of her nosebleeds, her medications, and her anxiety-related medical history. [*Id.* ¶¶ 40-41]. On February 16, 2024, Murphy submitted a written rebuttal to Senior Vice President/Human Resources and Training Officer Kristy Bolen ("Bolen"), recounting Thompson's (i) comments regarding her daughter and overtime, (ii) intrusive medical inquiries, (iii) purported undermining of Murphy's credibility and information-security efforts, and (iii) concern that employees were "upping" antidepressant and anti-anxiety medications rather than working in a positive environment. [*Id.* ¶ 42].

After receiving no response, Murphy provided the same written rebuttal to President Bagwell on March 28, 2024. [*Id.*, ¶ 43]. Bolen later informed Murphy that a third-party consulting firm, Total Compliance Connection ("TCC"), would

investigate her complaints regarding discrimination, internal-control issues, and policy violations. Murphy alleges she cooperated fully, including a one-hour interview with TCC on May 16, 2024. [*Id.* ¶¶ 45-46]. On June 26, 2024, Murphy met with President Bagwell, Bolen, and a TCC investigator, was informed that TCC could not corroborate her allegations, and again reported that Vision Bank had engaged in "legal wrongdoing." Murphy alleges President Bagwell left the meeting without speaking and Bolen became confrontational. Vision Bank terminated Murphy's employment the following day, on June 27, 2024. [*Id.* ¶¶ 48-49].

### B. PROCEDURAL HISTORY

After exhausting administrative remedies, Murphy filed this action on April 30, 2025. [Dkt. 2; Dkt. 22, ¶¶ 7-10]. She subsequently amended her complaint, asserting: (1) a Title VII claim for gender discrimination; (2) a Title VII claim for religious discrimination; (3) a Title VII retaliation claim; (4) an ADA discrimination claim; (5) an ADA retaliation claim; and (6) a claim for wrongful termination in violation of Oklahoma public policy. [Dkt. 22]. By express consent of all parties [Dkt. 17], and pursuant to Fed. R. Civ. P. 73(a) and 28 U.S.C. § 636(c)(1), the undersigned United States Magistrate Judge exercises complete jurisdiction over this action through and including trial and entry of a final judgment.

## II.  DISMISSAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible when the pleaded facts allow the Court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. The Court disregards legal conclusions and "[t]hreadbare recitals of the elements of a cause of action." *Id.*; *see also* <u>Kansas Penn Gaming, LLC v. Collins</u>, 656 F.3d 1210, 1214-15 (10th Cir. 2011). The question is whether the complaint alleges facts supporting all elements necessary to relief under the proposed legal theories. <u>Lane v. Simon</u>, 495 F.3d 1182, 1186 (10th Cir. 2007).

## III.   ANALYSIS

### A.   TITLE VII DISCRIMINATION | COUNTS I & II

Title VII prohibits an employer from discriminating against an individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's … race, color, religion, sex, or national origin." <u>42 U.S.C. § 2000e-2(a)(1)</u>. To state a plausible discrimination claim, a plaintiff need not establish a *prima facie* case under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), but the elements of that burden-shifting framework are helpful in assessing plausibility. *See* <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510-12 (2002); <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1192-93 (10th Cir. 2012). Those elements include (1) membership in a protected class, (2) an adverse employment action, and (3) circumstances giving rise to an inference of discrimination. *See* <u>Bennett v. Windstream Commc'ns, Inc.</u>, 792 F.3d 1261, 1266 & n.1 (10th Cir. 2015).

#### 1.   **Sex-Plus Discrimination**

Murphy alleges she was terminated "because of her gender *and* perceived

5

familial responsibilities based on her gender." [Dkt. 22, ¶ 56 (emphasis added)]. This is a "sex-plus" claim, specifically sex-plus-motherhood, which is cognizable under Title VII. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (recognizing sex-plus-motherhood as a form of sex discrimination); *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 657-65 (2020). Murphy also alleges she is a woman and mother, satisfying the protected-class component. [*Id.* ¶¶ 11, 55]. As to the second element, termination is a paradigmatic adverse employment action under Title VII. *See EEOC v. BCI Coca-Cola Bottling Co.* ("*BCI Coca-Cola*"), 450 F.3d 476, 484 (10th Cir. 2006).

The remaining question is whether Murphy plausibly alleges that her termination occurred under circumstances suggesting sex-plus discrimination. Murphy alleges that: (i) Thompson told her she lacked the ability to manage her staff because she "had a daughter at home" who prevented her from working the overtime Thompson deemed necessary, and then removed Murphy's supervisory duties; (ii) Murphy challenged this explanation in writing; (iii) Thompson targeted other female executives and mothers by disparaging their performance and pushing them out; and (iv) at least two similarly situated male employees with children retained their supervisory roles and, in one case, received promotion despite Thompson's criticisms of their performance. [*Id.* ¶¶ 28-35, 40, 42]. These allegations, taken as true, describe differential treatment of a female employee with childcare responsibilities, by the same decisionmaker, as compared to male employees who allegedly shared similar parental responsibilities.[1]

---

[1] *See Ibrahim v. Alliance for Sustainable Energy*, 994 F.3d 1193, 1196 (10th Cir. 2021) (a *prima facie* case may be shown where a plaintiff in a protected class was treated less favorably than similarly

At the pleading stage, Murphy need not prove that the identified male employees are perfect comparators; she must allege facts that, if true, support a reasonable inference of sex-based disparate treatment. *See Khalik*, 671 F.3d at 1193-94. Viewing the allegations in the light most favorable to Murphy, the FAC plausibly alleges that her sex and her status as a mother were at least motivating factors in her termination. *See Bostock*, 590 U.S. at 657-65 (Title VII is violated when sex is a "but-for" cause among others). The motion to dismiss Count I is therefore denied.

### 2. Religious Discrimination

Murphy alleges she is a practicing Methodist and that she was open about her faith at work. [Dkt. 22, ¶ 11, 20]. The FAC further alleges that from 2023 through Murphy's termination, Thompson "repeatedly voiced hostility" toward her Christian faith and her membership in the Methodist Church, criticized the church's withdrawal from the United Methodist Conference, and made "repeated[], consistent[], and open[]" anti-religious remarks about employees she suspected were religious. [*Id.* ¶¶ 19-20]. She alleges Thompson targeted Christian subordinates such as Stacy Lewis and Lori Privett with disparaging comments and adverse actions, while not directing similar adverse treatment at her Southern Baptist supervisor, President Bagwell, despite expressing "extreme dislike" for that denomination. [*Id.* ¶¶ 21-23].

Murphy again alleges termination as the adverse action. The above allegations, if true, describe explicit hostile remarks about Murphy's religion and that

---

situated employees who share a supervisor, are subject to the same standards, and engaged in comparable conduct).

7

of similarly situated Christian subordinates by a decisionmaker, coupled with alleged adverse employment actions against those individuals. Hostile remarks by a decisionmaker tied to a protected trait, combined with differential treatment of similarly situated employees, can support an inference of discriminatory motive. *See* EEOC v. PVNF, LLC, 487 F.3d 790, 800-01 (10th Cir. 2007).

Although Vision Bank argues that the FAC does not specify the exact timing of each comment relative to Murphy's termination, Rule 8 does not require such granularity at the pleading stage where the complaint alleges a pattern of hostility "from 2023 through Murphy's termination" and identifies specific religious subordinates allegedly pushed out or fired. *See* [*Id.* ¶¶ 19-23, 49]. *See* Bennett, 792 F.3d at 1266 (complaint must plausibly—not conclusively—suggest discrimination). The Court concludes that Murphy has plausibly alleged that religion was a motivating factor in the decision to terminate her employment. The motion to dismiss is denied as to Count II.

### B. TITLE VII RETALIATION | COUNT III

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because she "opposed" an unlawful employment practice or "made a charge, testified, assisted, or participated" in a Title VII proceeding. 42 U.S.C. § 2000e-3(a). To state a plausible retaliation claim, a plaintiff must allege that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action.

8

See *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227-28 (10th Cir. 2008).

Murphy alleges that she engaged in protected activity by: (i) submitting a written rebuttal on February 16, 2024 challenging Thompson's performance-review comments that tied her supervisory ability to having "a daughter at home"; (ii) escalating the same concerns to President Bagwell on March 28, 2024; (iii) reiterating her view that Vision Bank had engaged in "legal wrongdoing" at the June 26, 2024 meeting concerning the TCC investigation. [Dkt. 22, ¶¶ 42-43, 48]. Internal complaints to supervisors or HR about perceived discrimination can constitute protected opposition so long as the employee communicates a good faith belief that the employer has engaged in conduct made unlawful by Title VII. *See Fye*, 516 F.3d at 1227-28; *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171-72 & n.5 (10th Cir. 2003); *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Murphy's alleged statements—challenging remarks explicitly tying her supervisory ability to parental status and complaining of sex-based hostility—plausibly qualify as protected opposition.

With respect to the second element, termination is materially adverse. *See BCI Coca-Cola*, 450 F.3d at 484. As to causation, Murphy alleges that Vision bank terminated her employment less than twenty-four hours after the June 26, 2024 meeting in which she again raised her discrimination concerns. [*Id.* ¶¶ 48-49]. "Very close" temporal proximity between protected activity and adverse action can, by itself, establish causation at the *prima facie* stage. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (one-and-a-half months may suffice; three months,

9

standing alone, is typically insufficient). A one-day interval easily falls within that range. See *Fye*, 516 F.3d at 128. The Fac thus plausibly alleges protected activity, a materially adverse action, and a causal connection. The motion to dismiss Count III is denied.

### C.  ADA DISCRIMINATION  |  COUNT IV

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" in regard to hiring, discharge, or other terms and conditions of employment. 42 U.S.C. § 12112(a). A plausible ADA discrimination claim generally requires allegations that (1) the plaintiff is "disabled" within the meaning of the ADA; (2) she is a "qualified individual"; and (3) she suffered an adverse employment action "because of" disability. See *Adair v. City of Muskogee*, 823 F.3d 1297, 1304-05 (10th Cir. 2016).

Murphy alleges she has been diagnosed with Anxiety and depression that substantially limit her ability to concentrate, sleep, and interact with others. [Dkt. 22, ¶ 95]. The ADA defines "disability" to include mental impairments that substantially limit major life activities such as concentrating and sleeping. 42 U.S.C. §§ 12102(1)-(2). She further alleges a history of treatment and that Thompson repeatedly questioned her about the names and dosages of medications, her provider, and her therapist, and reacted to a visible manifestation of her anxiety by publicly interrogating her about her medical history. [*Id.* ¶¶ 18, 37-41]. These allegations are not mere formulaic recitations; rather, they identify specific impairments, related

major life activities, and facts from which a disability can be plausibly inferred. *See* Smothers v. Solvay Chems., Inc., 740 F.3d 530, 545-46 (10th Cir. 2014).

Murphy also alleges that she successfully performed her job, was promoted through multiple senior roles, and received the maximum pay increase in her 2023 job performance, and that she could perform the essential functions of her job with or without reasonable accommodation. [*Id*. ¶¶ 24, 54, 96]. These allegations are sufficient at the pleading stage to show Murphy is a "qualified individual." *See* Adair, 823 F.3d at 1307-10.

Murphy further alleges Vision Bank terminated her and, immediately after the February 2, 2024 anxiety episode, stripped her of supervisory responsibilities and subjected her to intrusive public questioning about her condition, and that similarly situated employees without disabilities (or whose disabilities were unknown) were not subjected to such treatment or termination. [*Id*. ¶¶ 40-41, 97-99]. Taken as true, these facts plausibly connect adverse actions to manifestations of Murphy's anxiety and to Thompson's scrutiny of her mental-health conditions. *See* Adair, 823 F.3d at 1304-05; Smothers, 740 F.3d at 545-46. Accordingly, the motion to dismiss Count IV is denied.

### D.  ADA RETALIATION | COUNT V

The ADA's anti-retaliation provision prohibits discrimination against an individual because she "opposed any act or practice made unlawful" by the ADA or "made a charge, testified, assisted, or participated in any manner" in an ADA proceeding. 42 U.S.C. § 12203(a). A plausible ADA retaliation claim requires

allegations that (1) the plaintiff engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186-87 (10th Cir. 2016). As termination constitutes a materially adverse action under the ADA, only the first and third elements are at issue here. *See McNellis v. Douglas Cnty. Sch. Dist.*, 115 F.4th 1122, 1143 (10th Cir. 2024).

Murphy alleges that her February 16, 2024 performance-review rebuttal, March 28, 2024 escalation, and subsequent participation in the TCC investigation constituted protected activity because she complained of disability-related mistreatment, including Thompson's comments about needing to "up" antidepressant and anti-anxiety medications and her intrusive medical inquiries. [Dkt. 22, ¶¶ 42, 77-82, 109-114]. Informal complaints to management can qualify as protected activity if they convey opposition to conduct the employee reasonably believes is unlawful under the ADA. *See id.* at 1186-87; *see also Hertz*, 370 F.3d at 1015 (protected opposition can "range from filing formal charges to voicing informal complaints to superiors"). Murphy's allegations are sufficient to plausibly allege such opposition.

She further alleges that Vision Bank terminated her on June 27, 2024, one day after the June 26 meeting at which she again raised concerns about wrongdoing, and that the relevant decisionmakers were aware of her complaints and participation throughout. [*Id.* ¶¶ 82-83, 113-115]. As with Title VII, very close temporal proximity can satisfy causation at this stage. *See Foster*, 830 F.3d at 1189-90. The one-day

interval alleged here is sufficient. Accordingly, the FAC states a plausible ADA retaliation claim, and the motion to dismiss is denied as to Count V.

### E. WRONGFUL TERMINATION IN VIOLATION OF OKLAHOMA PUBLIC POLICY | COUNT VI

Oklahoma recognizes a narrow exception to the at-will employment doctrine when an employee is discharged in violation of Oklahoma public policy. *Burk v. K-Mart Corp.*, 1989 OK 22, ¶¶ 19-22, 770 P.2d 24, 29. A "*Burk* tort" lies when an employee is discharged "for refusing to act in violation of an established and well-defined public policy" or "for performing an act consistent with a clear and compelling public policy." *Id.*, ¶ 19, 770 P.2d at 29. To prevail on a *Burk* claim, a plaintiff must identify "an Oklahoma public policy goal that is clear and compelling and articulated in existing constitutional, statutory or jurisprudential law." *McCrady v. Okla. Dep't of Public Safety*, 2005 OK 67, ¶ 9, 122 P.3d 473, 475 (*citing Clinton v. State ex rel. Logan Cnty. Election Bd.*, 2001 OK 52, ¶ 8, 29 P.3d 543, 546). Whether the cited source articulates a clear mandate of public policy is a question of law. *Id*. Courts may dismiss at the pleading stage where the plaintiff fails to allege a clear expression of public policy. *Burk*, ¶ 18, 770 P.2d at 29.

Murphy alleges she is an at-will employee and that Vision Bank terminated her "for reporting internal control violations in an attempt to discourage fraud" under Oklahoma Administrative Code § 85:10-5-2(d). [Dkt. 22, ¶ 125]. Section 85:10-5-2(d) provides:

> In order to obtain the maximum protection economically feasible it is necessary that all concerned by continually aware of the fundamental principles with respect to sound internal checks and controls and internal auditing. An objective in any bank or trust company control

13

> program is to discourage fraud, not necessarily to discover its existence. A program of safeguards must be implemented to meet this primary objective.

Murphy alleges that, in furtherance of this fraud-deterrence objective, she reported that a senior executive repeatedly failed internal phishing-test exercises and undermined the bank's information-security efforts, and that an employee improperly uploaded confidential customer information into ChatGPT in violation of internal controls previously reviewed by the board. She alleges she documented these concerns in an Identity Theft Risk Assessment and in a report to the administrative risk committee, and that she was terminated shortly after reiterating these concerns during a June 26, 2024 meeting regarding the investigation into her disclosures. [*Id.*, ¶¶ 25-27, 42, 48-49, 125-127]. She also alleges there is no other adequate statutory remedy to vindicate the banking-fraud-deterrence policy embodied in § 85:10-5-2(d). [*Id.* ¶ 126].

Vision Bank argues that § 85:10-5-2(d) is too general to constitute a "clear mandate" of public policy and that the internal controls listed in § 85:10-5-3 concern only traditional audit and ledger controls, not phishing-test failures or AI-related data-security issues. At the pleading stage, however, the Court must accept Murphy's factual allegations and draw all reasonable inferences in her favor. *See Iqbal*, 556 U.S. at 678-79. Regardless, § 85:10-5-2(d) does more than set forth a generalized aspiration; it articulates a specific regulatory policy that Oklahoma-regulated banks must implement internal check, control, and auditing programs, and a "program of safeguards," whose "objective … is to discourage fraud." That policy plainly relates to the protection of bank customers and the integrity of the banking system. The

14

Oklahoma Supreme Court has recognized Burk claims grounded in specific statutory or regulatory policies designed to protect the public from fraud, corruption, or unsafe practices. *See, e.g.*, McCrady, ¶¶ 9-11, 122 P.3d at 475-76; Hayes v. Eateries, Inc., 1995 OK 108, ¶¶ 14-20, 905 P.3d 778, 784-85. Murphy's allegations, if true, would permit a reasonable inference that her reports concerned information-security failures and misuse of customer data that undermined Vision Bank's fraud-deterrent internal control program and were made in an effort to ensure compliance with § 85:10-5-2(d).

Whether phishing-test regimes and controls on uploading customer data to AI tools are among the "safeguards" and "internal checks and controls" contemplated by § 85:10-5-2(d) and related provisions is better resolved on a fuller factual record. At the Rule 12(b)(6) stage, Murphy has identified a specific regulatory provision with a clear fraud-deterrence objective and tied her alleged protected conduct and termination to that policy. She has also alleged a plausible *Burk* claim. *See* Collier v. Insignia Fin. Grp., 1999 OK 49, ¶ 5, 981 P.2d 321, 323 (*Burk* applies where discharge is contrary to clearly articulated policy and no adequate statutory remedy exists). The motion to dismiss Count VI is therefore denied.

## IV.  CONCLUSION

WHEREFORE, the motion to dismiss [Dkt. 29] filed on behalf of defendant Vision Bank is hereby **DENIED**.

IT IS SO ORDERED on this 19th day of February, 2026.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE